# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**FIRST AMERICAN TITLE
INSURANCE COMPANY,
STEWART TITLE GUARANTY
COMPANY, and OLD REPUBLIC
NATIONAL TITLE INSURANCE
COMPANY**,

        Plaintiffs,

        vs.                              No. 1:11-CV-00391-MCA-ACT

**MANUEL ORTIZ, SR., LAWRENCE
M. ORTIZ, LEANDRO A. ORTIZ,
RAYMOND I. TRUJILLO, MELISSA
R. ORTIZ, RAYMOND I. TRUJILLO,
HERMAN F. GONZALES, and LA
MERCED DE ARROYO HONDO,
*doing business as* ARROYO HONDO
GRANT,**

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Plaintiffs' Motion for Summary Judgment
and Request for Expedited Consideration of Same* [Doc. 26]. On March 26, 2012, the
Court held oral argument and later requested supplemental briefing on the issue of
whether Plaintiff title insurance companies have standing to raise the claims asserted in
their *Complaint for Declaratory Judgment and Injunction* [Doc. 1]. [See Docs. 44, 51, 53,
55, 56] Having considered the submissions, the relevant case law, and otherwise being

fully advised in the premises, the Court concludes that Plaintiffs lack standing.

Accordingly, Plaintiffs' motion for summary judgment is denied and Plaintiffs' complaint

is dismissed without prejudice.

## I.      BACKGROUND

The following facts are undisputed and/or deemed admitted for the purpose of

Plaintiffs' motion for summary judgment. <u>See</u> D.N.M.LR-Civ 56.1(b) ("All material facts

set forth in the statement of the movant will be deemed admitted unless specifically

controverted.).

The Arroyo Hondo Grant is a land grant[1] north of the Town of Taos, which

---

[1]

From the end of the seventeenth century to the middle of the nineteenth
century, Spain and Mexico issued grants of land to individuals, groups, towns,
pueblos, and other settlements in order to populate present-day New Mexico.
Academic treatises and popular literature typically divide these grants into two
types: "individual grants" and "community land grants." Grants awarded to
towns and other settlements were modeled on similar communities created in
Spain, where the king granted lands adjacent to small towns for common use by
all town residents. Under Spanish and Mexican law in the territory of New
Mexico, officials made grants to towns and other communities. These grants
usually contained sufficient land and water resources to facilitate settlement and
the establishment of communities.

Gen. Accounting Office, GAO-01-951, Report to Congressional Requesters, *Treaty of
Guadalupe Hidalgo:  Definition and List of Community Land Grants in New Mexico* 3 (Sept.
2001).

Under Spanish and Mexican law, common lands set aside as part of an original
grant could not be sold. Typically, in addition to use of common lands, settlers on
a community land grant would receive individual parcels of land designated for
dwelling (*solar de casa*) and growing food (*suerte*). Unlike the common lands,
these individual parcels could be sold or otherwise disposed of by a settler who
fulfilled the requirements of the grant, such as occupying the individual parcel for
a continuous period.

originally was composed of approximately 20,000 acres. [Doc. 1-2 at 8]  The Arroyo

Hondo Grant was founded by "Nerio Sisneros and the forty-four families with him" and

was confirmed by the Court of Private Claims[2] as Patent Number 159 on April 20, 1908.

[Doc. 1-2 at 9-19]  Hereinafter, the Court will refer to the Arroyo Hondo Grant as the

_____

*Id.* at 7.

The Arroyo Hondo Land Grant can be traced back to an 1815 petition by "Nerio Sisneros and 'various associates'" asking for a tract of land to form a new settlement on the Arroyo Hondo. New Mexico Office of the State Historian, *Arroyo Hondo Grant*, www.newmexicohistory.org/filedetails.php?fileID=24854.  The grant from the Spanish government provided that the commons were to be held for the benefit of all inhabitants of the settlement.  *Id.*

In 1854, Congress enacted legislation creating the Office of the Surveyor General and establishing procedures for settling land grant claims in the Territory of New Mexico.  David Benavides & Ryan Golten, *Righting the Record:  A Response to the GOA's 2004 Report* Treaty of Guadalupe Hidalgo:  Findings and Possible Options Regarding Longstanding Community Land Grant Claims in New Mexico, 48 Nat. Resources. J. 857, 865 (2008). In 1887, certain claimants petitioned the Surveyor General for confirmation of the Arroyo Hondo Grant. *Arroyo Hondo Grant*, *supra*. The confirmation process under the 1854 Act was not yet complete when, in 1891, Congress enacted legislation repealing the 1854 Act and creating the Court of Private Land Claims.  *Id.*; 26 Stat. 854 (1891).  In 1891, Julian Martinez and others brought suit in the Court of Private Land Claims seeking recognition of the Arroyo Hondo Grant as a community grant. *Arroyo Hondo Grant*, *supra*.  In December 1892, the court confirmed the grant. Thereafter, as provided by the 1891 Act, 26 Stat. 854, § 10, the grant was surveyed. This first survey was successfully challenged by the United States.  *Id.* A second survey, using a new eastern boundary, reduced the size of the grant from 30,674.22 acres to 20,000.38.  *Id.* The re-surveyed grant was patented on April 9, 1908.  *Id.*; [Doc. 1-2 at 19].  The record before the Court is silent as to the history of Arroyo Hondo Land Grant between the issuance of the patent in 1908 and the events giving rise to this lawsuit.

For general background on the ongoing controversy between land grant heirs and current owners of lands included in the original Arroyo Hondo Land Grant, see U.S. Gen. Accounting Office, GAO-04-59, Report to Congressional Requesters, *Treaty of Guadalupe Hidalgo: Findings and Possible Options Regarding Longstanding Community Land Grant Claims in New Mexico*, (June 2004) ("GAO-04-59") and Benavides & Golten, *supra*.

[2]For a discussion of practice under the 1891 Act see GAO-04-59 at 83-91.

3

"Patent Land."

Defendants Lawrence M. Ortiz, Leandro A. Ortiz, Raymond I. Trujillo, Melissa R. Ortiz, and Herman F. Gonzales are members of the Board of Trustees (Board) of Defendant La Merced de Arroyo Hondo, doing business as the Arroyo Hondo Grant (Arroyo Hondo Grant).  [Doc. 26-1 at 20]  On June 4, 2009, the Board's bylaws (Bylaws) were filed in the Secretary of State's Office, Land Grant Registry.  [Doc. 26-1 at 1]  The Bylaws provide that "[t]he purpose of this Board of Trustees is to conduct business activities for the benefit of the Arroyo Hondo Grant and the Heirs of the Arroyo Hondo Grant Board." [Doc. 26-1 at 2]  To qualify as an heir, an applicant "must be 18 years of age or older," "must be a direct descendant through blood line or legal adoption of an original settler, and therefore an Heir of Nerio Sisneros or one of the forty-four families who settled the Arroyo Hondo Grant," and "must be certified by the Board of Trustees on [the] By-Laws." [Doc. 26-1 at 3]  The Bylaws provide that "non-heirs" may be evicted from the Patent Land by a majority vote of the Board, in relevant part, for:

> failure to acknowledge the proprietary claim, by patent in perpetuity, of the Heirs of the Assignees of Nerio Sisneros and the forty four families with him and therefore the Arroyo Hondo Grant, to all the real properties, natural resources, watersheds, aquifers, timber, petroleum and natural gas reserves other than gold, silver, quick silver, mineral lodes, livestock grazing, historical rights, traditional privileges, and all so called community lands (held in common) or public lands (directly, indirectly, or covertly government owned or operated), structures, aqueducts, roadways, causeways, easements for utilities and locally occurring utilities within, beneath and above the well-defined and established exterior boundaries of the Arroyo Hondo Grant.

[Doc. 26-1 at 6]

4

On October 20, 2010, Defendants Leandro A. Ortiz and Lawrence M. Ortiz executed a "Declaration of Assignees Update of Patent[,] Patent Number 159" (Declaration), which was filed in the land records of the Taos County Clerk.  [Doc. 1-2 at 1; Doc. 26 UMF #1]  In the Declaration, Leandro A. Ortiz and Lawrence M. Ortiz "severally certify and we . . . bring up this land patent in our . . . name(s)" as "notice of preemptive right." [Id. at 1]  The Declaration provides, in relevant part, that "[a] patent for land is the highest evidence of title and is conclusive as evidence against the government and all claiming under junior patents or titles . . . ." [Id. at 2]  Attached to the Declaration was a copy of Patent Number 159, an alleged survey of the Patent Land, and two deeds (Deeds). [Id. at 8-19]

The first deed, which was executed on October 10, 2010, is a quitclaim deed by which the grantor, Defendant Manuel Ortiz, Sr., quitclaimed to the grantees, "the Heirs of the Arroyo Hondo Grant, whom are the Heirs of Nerio Sisneros and 44 original settlers who accompanied them" and "the Arroyo Hondo Grant Board of Trustees which is comprised of Heirs selected according to the By-Laws of the Arroyo Hondo Grant," the following:

> all the right, title, interest, and claim which said grantor has in and to the following described parcel of land,
> See Exhibit "A" U S Patent #159 attached hereto and made a part hereof
> See Exhibit "B" Surveyor General Plat Map attached hereto and made a part hereof
> with all improvements and appurtenances thereto in Taos County, New Mexico

[Doc. 1-2 at 6] The second deed, which was also executed on October 10, 2010, is a joint

5

tenant warranty deed, by which the grantor, Defendant Manuel Ortiz, Sr., transferred to

the grantees, "the Heirs of the Arroyo Hondo Grant, whom are the Heirs of Nerio

Sisneros and 44 original settlers who accompanied them" and "the Arroyo Hondo Grant

Board of Trustees, which is comprised of Heirs selected according to the By-Laws of the

Arroyo Hondo Grant" the following:

>See Exhibit "A" U S Patent # 159 attached hereto and made a part hereof
>See Exhibit "B" U S Surveyor General plat map attached hereto and made a
>part hereof
>Said tract or parcel of land contains 20629.38 acres with all rights
>appurtenant thereto.

[Doc. 1-2 at 7]

On May 6, 2011, the Plaintiff title insurance companies, First American Title

Insurance Company, Stewart Title Guaranty Company, and Old Republic National Title

Insurance Company, filed their *Complaint for Declaratory Judgment and Injunction*

[Doc. 1] on the basis of diversity jurisdiction under 28 U.S.C. § 1332.[3]  Plaintiffs'

---

[3]Plaintiffs also asserted the existence of federal question jurisdiction under 28 U.S.C. §1331 "[t]o the extent that the relief requested requires an examination of the meaning and effect of the subject federal patent, issued pursuant to federal law."  [Doc. 1 at 3]  However, "a controversy over lands is not recognizable under section 1331 simply because title can be traced to a patent issued by the United States."  <u>Simpson v. State of Utah</u>, 365 F.2d 185, 187 (10th Cir. 1966); <u>see also Virgin v. County of San Luis Obispo</u>, 201 F.3d 1141, 1143 (9th Cir. 2000) ("Federal land patents and acts of Congress do not provide bases for federal question jurisdiction.").  As the United States Supreme Court observed in <u>Shulthis v. McDougal</u>, 225 U.S. 561 (1912):

>A suit to enforce a right which takes its origin in the laws of the United States is
>not necessarily, or for that reason alone, one arising under those laws, for a suit
>does not so arise unless it really and substantially involves a dispute or
>controversy respecting the validity, construction, or effect of such a law, upon the
>determination of which the result depends.  This is especially so of a suit
>involving rights to land acquired under a law of the United States.  If it were not,

complaint seeks the following: (1) a declaratory judgment pursuant to NMSA 1978,

Section 44-6-4 (1975) and 28 U.S.C. § 2201 "decreeing that the Deeds and Declarations

are null, void, and have no legal force or effect because, and irrespective of any issues

concerning the existence and nature of the Arroyo Hondo Grant or the Board, Manuel

Ortiz, Sr., had no cognizable ownership interest in any portion of the Patent Land except

such parts thereof, if any, to which he held title individually, at the time of delivery of the

Deeds, and Manuel Ortiz, Sr., could therefore not transfer, nor could Defendants acquire,

title to Patent Land to which he did not own title, individually, by delivery of the Deeds";

(2) a declaratory judgment pursuant to NMSA 1978, Section 44-6-4 (1975) and 28 U.S.C.

§ 2201 "decreeing that Manuel Ortiz, Sr.'s attempt to convey the realty interest described

in the Deeds is null, void, and of no legal force or effect because the attempt violates

[NMSA 1978, Sections] 49-1-11 and 49-1-11.1, except as to any portion of the Patent

Land to which he held title, individually; (3) a declaratory judgment pursuant to 28

U.S.C. § 2201 "decreeing that the deeds are void and of no force and effect because the

Patent did not . . . create an inalienable communal interest in Defendants in the Patent

---

every suit to establish title to land in the central and westerns states would so
arise, as all titles in those states are traceable back to those laws.

Id. at 569-70.; see also id. at 570 ("[A] controversy in respect of lands has never been regarded
as presenting a Federal question merely because one of the parties to it has derived his title under
an act of Congress.").  In this case, there is no "dispute or controversy respecting the validity,
construction, or effect" of a federal law, id., and, therefore, the Court lacks federal question
jurisdiction.  See Nicodemus v. Union Pacific Corp., 318 F.3d 1231, 1240 (10th Cir. 2003)
(holding that the district court lacked federal question jurisdiction to grant declaratory relief
because a suit "to enforce . . . rights under the federal land-grant statutes would fall outside of 28
U.S.C. § 1331.").

Land, . . . create an inalienable communal interest in the Patent Land which Manuel Ortiz,

Sr. could evoke or transfer pursuant to the Deeds, or . . . create an inalienable communal

interest which the Arroyo Hondo Grant or its nominal board members could receive or

effectively declare by the Deeds, Declarations, or Bylaws"; (4) a declaratory judgment

pursuant to NMSA 1978, Section 44-6-4 (1975) and 28 U.S.C. § 2201 "decreeing that the

By-laws are null, void, and of no legal force or effect because the Arroyo Hondo Grant is

not a duly organized land grant-merced under [NMSA 1978, Sections] 49-1-1 through -

19, and because the By-laws are, in any case, *ultra vires*"; (5) "If the Court determines

that any part of the Patent Land remains a communal land grant and that the Arroyo

Hondo Grant and the Board are duly created entities . . . a declaratory judgment pursuant

to [NMSA 1978, Section 44-6-4 (1975)] and 28 U.S.C. § 2201 decreeing the precise

nature of the present ownership rights, if any, of Defendants to the Patent Land"; and (6)

a permanent injunction enjoining "all Defendants and any subsequent member of the

Board, or any successor of the Board, from taking action to cloud title to the Patent Land

predicated upon claims of alleged communal ownership interests derived from the Patent,

except as to lands to which Defendants hold title as individuals." [Doc. 1 at 9-12]

On August 2, 2011, Plaintiffs filed *Plaintiffs' Motion for Summary Judgment and

Request for Expedited Consideration of Same* [Doc. 26].  In support of their motion for

summary judgment, Plaintiffs submitted the affidavit of David Height, owner of First

New Mexico Title & Abstract Company, Inc., which acts as an agent for First American

Title Insurance Company and Old Republic Title Insurance Company in the Taos area.

[Doc. 26-3] Mr. Height averred that First New Mexico Title & Abstract Company, Inc.

"is unable to issue title insurance policies for property within the Patent Lands without an

exception for the Declarations and Deeds." [Doc. 26-3 at 2] Mr. Height further averred

the following:

> Prior to filing the filing of the Declarations and Deeds, title insurers
> uniformly issued policies for properties within the Patent Lands without an
> exception for the matters raised by the Declarations and Deeds.  The filing
> of the Declarations and Deeds, therefore, has created potential expense and
> liability for the insurers of such titles, arising from demands on the affected
> title policies.  Further, new title insurance policies for transactions occurring
> after the filing of the Declarations and Deeds, and containing exceptions for
> same, have proven unacceptable to a number of buyers and mortgage
> lenders, inhibiting new transactions and thus the sale of new title insurance
> policies.

[Id.]

Plaintiffs also submitted the affidavit of John Kejr, President of the Taos County

Association of Realtors and an Associate Broker with Dreamcatcher Real Estate, Inc. in

Taos, New Mexico. [Doc. 26-6]  Mr. Kejr averred that "[t]he filing of the Declarations

and Deeds has clouded the titles to approximately 3,074 assessed properties within the

lands described in U.S. Patent No. 159"and that "[t]he cloud upon the title to realty within

the Patent Lands has inhibited real estate lenders, title insurers, buyers, and sellers,

materially limiting new real estate transactions concerning such land." [Doc. 26-6 at 1-2]

According to Mr. Kejr, "[t]he Taos County Association of Realtors estimates that, as of

mid-April, 2011, more than $9 million in real estate and financing business has been

delayed or, in some cases, abandoned, in connection with the filing of both the

Declarations and Deeds and the similar documents associated with the de la Serna grant."[4] [Doc. 26-6 at 2]

In their response, Defendant Board Members and the Arroyo Hondo Grant[5] (hereinafter referred to collectively as "Defendants") do not dispute that there is a disruption in the Taos real estate market, but instead contend that "it was not Defendants who created a disruption by filing the documents, but instead it was Plaintiffs and the other Title Insurance Companies in the Taos area who overlooked the legitimacy of the Arroyo Hondo Grant Patent # 159 that was issued by the Court of Private Land Claims." [Doc. 29 at 2]  Defendants argue that Plaintiffs' motion for summary judgment should be denied "because Plaintiffs have no standing to sue based on property that they do not own and in which they claim no direct property interest." [Id. at 5]

On February 23, 2012, the Court entered an *Order and Notice of Hearing*

---

[4]The Cristobal de la Serna land grant is another patented land grant located in Taos County, New Mexico.  As in the present case, the board members of the Cristobal de la Serna Land Grant Association filed certain deeds and declarations in the land records of the Taos County Clerk, which purported to convey the patented land to the Association and the heirs of Cristobal de la Serna.  The Town of Taos filed a declaratory judgment action in the Eight Judicial District, Taos County, New Mexico.  On July 27, 2011, the district court rendered default judgment in favor of the Town of Taos, holding that "two deeds are declared to be invalid, null and void and are hereby cancelled and set aside."  Town of Taos v. R. Gonzales, et al., D-820-CV-1100187 (July 27, 2011) (http://www2.nmcourts.gov/caselookup/app?component=cnLink&page=SearchResults&service =direct&session=T&sp=SD-820-CV-201100187); see Guttman v. Khalsa, 669 F.3d 1101, 1127 n.5 (10th Cir. 2012) (noting that courts have the authority to take judicial notice of public records, including court filings).

[5]Manuel Ortiz, Sr., has not filed a response to the motion for summary judgment or otherwise appeared in this matter.

scheduling oral argument "limited solely to the issue of standing and specifically in the context of whether Plaintiffs' *Motion for Summary Judgment* is supported by sufficient evidence demonstrating that there is no genuine issue of material fact with respect to standing." [Doc. 44 at 4-5]  The Court noted that Plaintiffs had alleged "two types of injuries: (1) contingent liability on title insurance policies issued before Defendants filed their Deeds and Declarations and (2) loss of business after Defendants filed their Deeds and Declarations." [Doc. 44 at 3]  The Court ordered the parties to be prepared to address at oral argument whether the proof submitted in support of Plaintiffs' *Motion for Summary Judgment* was sufficient, at this stage of the litigation, to establish that Plaintiffs had suffered an injury, traceable to Defendants and redressable by this Court. [Doc. 44]

Prior to oral argument, Plaintiffs filed a *Motion for Leave to Supplement the Record*, which this Court granted. [Docs. 45 and 50]  Plaintiffs supplemented the record with the affidavit of Joel K. Schantz, the owner and qualifying broker for Prudential Taos Real Estate, who "compared real estate transaction activity for the periods 2010, 2011 and to-date in 2012, with respect to the area encompassed by the original Arroyo Hondo Grant" and concluded that "[r]eal estate transactions specifically within the bounds of the original Arroyo Hondo Grant have declined, fewer transactions have closed, and fewer title policies premiums have been paid, as between 2010, and since." [Doc. 45-2] Additionally, Plaintiffs submitted the affidavit of Warren A. Robinson, Claims Center Director for First American Title Insurance Company, who averred that First American Title Insurance Company had received one title insurance claim "based upon the deed and

11

declaration issue." [Doc. 45-3]  Plaintiffs also submitted the affidavit of Carolyn Monroe,

Senior Vice President, Southwest Division Manager of Old Republic National Title

Insurance Company, who averred that "Old Republic has received verbal inquiry by an

insured concerning the process for filing a claim upon one of its title policies issued to the

owners of realty within the area claimed by Defendants, based upon the deed and

declaration in issue.  At this point, the insured has yet to take further action." [Doc. 45-4]

Additionally, Plaintiffs submitted evidence of certain real estate transactions within the

Patent Lands, which did not close due to the filing of the Deeds and Declarations. [Docs.

45-5 and 45-6]

On March 26, 2012, the Court held oral argument on the issue of Plaintiffs'

standing. [Doc. 51]  Following oral argument, the Court ordered simultaneous

supplemental briefing on the following questions:  (1) "Do Plaintiffs have standing under

the Declaratory Judgment Act, in the absence of a private right of action under New

Mexico state law?" and (2) "Do Plaintiff Title Insurance Companies have a private right

of action against the Defendant Board Members under NMSA 1978, § 49-1-11.1?" [Doc.

53]  In their supplemental brief, Plaintiffs concede that "a plaintiff seeking declaratory

relief from a federal court sitting in diversity must demonstrate the existence of a dispute

between the parties based on a substantive legal theory under state law." [Doc. 56 at 2]

Plaintiffs contend that they have an implied right of action under NMSA 1978, § 49-1-

11.1(B), which provides in relevant part, as follows:

The provisions of Chapter 49, Article 1 NMSA 1978 shall not diminish,

12

> extinguish or otherwise impair any private property interest located within the boundaries of a land grant-merced or be construed to grant the board of trustees of a land grant-merced regulatory authority over such property interests or lands other than the common lands.

Id. [Doc. 56]  Plaintiffs further contend that they have alleged and established a right to declaratory relief against Defendants based on *prima facie* tort, tortious interference with existing and prospective contractual relations, and equitable estoppel. [Id.]

## II.      STANDARD

"In every federal case, the party bringing the suit must establish standing to prosecute the action."  Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004). The Supreme Court's standing jurisprudence "contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing which embodies judicially self-imposed limits on the exercise of federal jurisdiction." Id. at 11 (internal quotation marks and citations omitted).

> To show that he has Article III standing, a plaintiff must demonstrate three elements: injury in fact, traceability, and redressability. To demonstrate an injury in fact, a plaintiff must show he has suffered an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. The element of traceability requires the plaintiff to show that the defendant is responsible for the injury, rather than some other party not before the court. Finally, the requirement of redressability ensures that the injury can likely be ameliorated by a favorable decision.

S. Utah Wilderness Alliance v. Office of Surface Mining Reclamation and Enforcement, 620 F.3d 1227, 1233 (10th Cir. 2010).

"[P]rudential standing encompasses the general prohibition on a litigant's raising

another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." <u>Elk Grove Unified Sch. Dist.</u>, 542 U.S. at 12 (internal quotation marks and citation omitted). "In the context of prudential standing, the source of the plaintiff's claim to relief assumes critical importance." <u>The Wilderness Soc. v. Kane County, Utah</u>, 632 F.3d 1162, 1171 (10th Cir. 2011) (en banc) (internal quotation marks and citation omitted).  This is because "[t]he question of prudential standing is often resolved by the nature and source of the claim.  Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." <u>Id.</u> at 1169 (internal quotation marks and citation omitted).

"The burden to establish standing rests on the party invoking federal jurisdiction, and the evidence needed to carry that burden depends on the stage of litigation." <u>Essence, Inc. v. City of Federal Heights</u>, 285 F.3d 1272, 1280 (10th Cir. 2002).  "When the procedural posture of the case is a Federal Rule of Civil Procedure 56 motion for summary judgment and plaintiffs' standing is at issue, to prevail on such a motion a plaintiff must establish that there exists no genuine issue of material fact as to justiciability, and mere allegations of injury, causation, and redressability are insufficient." <u>Id.</u> (internal quotation marks and citation omitted).

Additionally, "[p]laintiffs must have standing to seek each form of relief in each

14

claim." Coll v. First American Title, 642 F.3d 876, 891 (10th Cir. 2011) (internal

quotation marks and citation omitted).  The Declaratory Judgment Act, 28 U.S.C. § 2201,

does not create a substantive right of action.  See Mashunkashey v. United States, 131

F.2d 288, 290 (10th Cir. 1942) ("[T]he declaratory judgment act creates no new rights.").

"The Act merely provides a procedure empowering a federal court to declare the legal

rights and obligations of adversaries engaged in a justiciable controversy."  Kunkel v.

Continental Cas. Co., 866 F.2d 1269, 1273 (10th Cir. 1989).  "In a declaratory action

brought in federal court based on diversity of citizenship, state law rather than federal law

governs the substantive issues of the underlying coercive action."  12 Moore's Federal

Practice § 57.21[3][d] (3d Ed. 2012); see Air Liquide America Corp. v. Continental Cas.

Co., 217 F.3d 1272, 1275 (10th Cir. 2000) ("A federal court sitting in diversity applies the

substantive law . . . of the forum state.") (internal quotation marks and citation omitted).

        Accordingly, to determine whether Plaintiffs have standing to seek declaratory

relief, the Court must first identify the state law causes of action that Plaintiffs seek to

pursue or defend in their *Complaint for Declaratory Judgment and Injunction* [Doc. 1].

## III.    DISCUSSION

        It is important to emphasize that Plaintiffs do not represent their insureds or assert

the property rights of their insureds in this litigation.  Instead, Plaintiffs allege that they

have suffered their own economic injuries as a consequence of the filing of the Deeds,

Declarations, and Bylaws.  Specifically, Plaintiffs identify two types of alleged injuries:

(1) contingent liability on title insurance policies issued before Defendants filed the

Deeds and Declarations and (2) loss of business after Defendants filed the Deeds and

Declarations. [Doc. 26]  In *Plaintiffs' Supplemental Briefing*, Plaintiffs clarify that they

rely upon these injuries to assert the following state law claims against Defendants:  (1) a

violation of Section 49-1-11.1(B); (2) *prima facie* tort; (3) tortious interference with

existing and prospective contractual relations; and (4) equitable estoppel.  The Court will

address each of these claims in turn.

A.       Prima Facie Tort and Tortious Interference with Contractual Relations

         Although New Mexico recognizes a cause of action for *prima facie* tort and

intentional interference with existing or prospective contractual relations, Plaintiffs did

not raise these claims in their complaint or their motion for summary judgment.[6]

Additionally, Plaintiffs have not sought leave to amend their complaint pursuant to Fed.

R. Civ. P. 15.  Plaintiffs' *prima facie* tort and intentional interference with contractual

relations claims are not properly before the Court and, therefore, I decline to address

_____

         [6]See Guest v. Berardinelli, 195 P.3d 353, 363 (N.M. App. 2008) (the elements of
intentional interference with existing or prospective contractual relations are : (1)
Defendants' knowledge of an existing contract; (2) performance of the contract was
refused, (3) Defendants played an active and substantial part in causing Plaintiffs to lose
the benefits of the contract, (4) damages flowed from the breached contract, and (5)
Defendants induced the breach without justification or privilege);  Kitchell v. Public
Service Co. of New Mexico, 972 P.2d 344, 348 (N.M. 1998) (the elements of *prima facie*
tort are "1) an intentional and lawful act, 2) an intent to injure the plaintiff, 3) injury to the
plaintiff as a result of the intentional act, and 4) the absence of justification for the
injurious act.");  cf. Pater v. City of Casper, 646 F.3d 1290, 1299 (10th Cir. 2011)
(recognizing that "[a]n issue raised for the first time in a motion for summary judgment
may properly be considered a request to amend the complaint, pursuant to Federal Rule of
Civil Procedure 15.").

16

them.

      **B.**    *Equitable Estoppel*

      Plaintiffs contend that two Defendants, Manuel Ortiz, Sr. and Lawrence Ortiz, previously "had treated land within the Grant as freely alienable in fee simple" and, therefore, these Defendants are equitably estopped from asserting via the Deeds and Declarations that the Patent Land is held in common by the Board. [Doc. 56 at 11] "Equitable estoppel precludes a litigant from asserting a claim or defense that might otherwise be available to him against another party who has detrimentally altered his [or her] position in reliance on the former's misrepresentation or failure to disclose some material fact." Gallegos v. Pueblo of Tesuque, 46 P.3d 668, 677 (N.M. 2002) (internal quotation marks and citation omitted); see also Continental Potash, Inc. v. Freeport-McMoran, Inc., 858 P.2d 66, 73 (N.M. 1993) ("Estoppel precludes one party from asserting a right when another party has relied to his detriment upon the acts or conduct of the first party and when asserting that right would prejudice the other who has acted thereon in reliance."). Although equitable estoppel may be "raised by the initiator of a declaratory judgment action," Memorial Medical Ctr., Inc. v. Tatsch Const., Inc., 12 P.3d 431, 435 n.1 (N.M. 2000), it does not "create a new right, impose a new obligation, or give a cause of action; rather . . . [it] preserve[s] rights already acquired." 28 Am. Jur. 2d, Estoppel and Waiver, § 30 (2012); see Mannick v. Wakeland, 117 P.3d 919, 927 (N.M. App. 2004) (recognizing that the doctrine of equitable estoppel is "considerably . . . limited" and that "[t]he conduct of the party to be estopped must be

something which amounts either to a representation or a concealment of the existence of

facts; and these facts must be material to the rights or interests of the party affected by the

representation or concealment.") (internal quotation marks and citation omitted); 1 Dan B.

Dobbs, Dobbs Law of Remedies §2.3(5), p. 87 (2d Ed. 1993) ("It is often said that

estoppel is a shield, not a sword: it does not furnish a basis for damages claims, but a

defense against the claim of the stopped party.").  Because the doctrine of equitable

estoppel is not a substantive cause of action, Plaintiffs' reliance on this doctrine is

misplaced.

C.      _Section 49-1-11.1(B)_

        A land grant-merced is "a grant of land made by the government of Spain or by the

government of Mexico to a community, town, colony or pueblo or to a person for the

purpose of founding or establishing a community, town, colony or pueblo."  § 49-1-

1.1(B).  Land grant-mercedes are "managed, controlled and governed by their bylaws, by

the Treaty of Guadalupe Hidalgo and as provided in Sections 49-1-1 through 49-1-18

NMSA 1979 as political subdivisions of the state."  § 49-1-1.  "The management and

control of all land grants-mercedes and tracts of land to which Sections 49-1-1 through

49-1-18 NMSA 1978 are applicable is vested in a board of trustees . . ."  § 49-1-3.  "The

authority of the Board is entirely statutory." Maestas v. Bd. of Trustees of the Anton

Chico Land Grant, 703 P.2d 174, 175 (N.M. 1985).  "The principle function of the Board

is to control, care for, manage, and govern the Grant and its common lands, and it may

sue or be sued in its official capacity."  Id; see § 49-1-3(B) (providing that the board of

trustees has the power to "sue and be sued under the title as set forth in this section").

An "heir" is defined as "a person who is a descendant of the original grantees and has an interest in the common land of a land grant-merced through inheritance, gift or purchase." § 49-1-1.1(A). A person who is not an heir, but who purchases or leases property within the exterior boundaries of a land grant-merced, "shall only have a right to the lands acquired through the purchase or lease but not to any common lands within the land grant-merced." § 49-1-11.1(A). Conversely, Section 49-1-11.1(B) provides that:

> The provisions of Chapter 49, Article 1 NMSA 1978 shall not diminish, extinguish or otherwise impair any private property interest located within the boundaries of a land grant-merced or be construed to grant the board of trustees of a land grant-merced regulatory authority over such property interests or lands other than the common lands. As used in this subsection "property interest" includes valid easements and rights of access, but does not include use rights to the common lands of the land grant-merced.

§ 49-1-11.1(B).

Plaintiffs contend that Defendants violated Section 49-1-11.1(B) when they filed the Deeds and Declarations, which purport to convey private property located within the exterior boundaries of the Patent Land to the Defendant Board Members. Although the statute does not provide for a private right of action, Plaintiffs argue that, pursuant to National Trust for Historic Preservation, New Mexico Courts would recognize a private right of action against Defendants for the enforcement of Section 49-1-11.1(B).

In National Trust for Historic Preservation, the New Mexico Court of Appeals held that it was "fundamental that a plaintiff has standing to protect himself against injury as a result of unlawful governmental action, even in the absence of a controlling statute or

19

constitutional provision." Id. (quoting De Vargas Savings & Loan Ass'n v. Campbell, 535 P.2d 1320, 1323 (N.M. 1975)). Thus, when "the governing statute is silent regarding who may bring a statutorily recognized action to require a public agency to comply with state law, one who is 'injured' by the allegedly unlawful conduct ordinarily may bring suit." Id. The Court recognized, however, that the "determination of who is an 'injured' party may be difficult in some circumstances." Id.

Section 49-1-11.1(B) does not explicitly provide for a private right of action against the board members of a land grant-mercedes. However, Section 49-1-3 plainly provides that the Board may "sue and be sued under the title as set forth in this section." Additionally, Section 49-1-1 provides that the Board shall be "managed, controlled and governed . . . as a political subdivision of the state." Under these circumstances, the Court assumes, without deciding, that New Mexico would recognize a private right of action to compel the Board of a land grant-mercedes to comply with state law. Nat'l Trust for Historic Pres., 874 P.2d at 802.

The more pertinent question is *who* has standing to pursue a private right of action against the Board.[7] Pursuant to National Trust for Historic Preservation only "one who is 'injured' by the allegedly unlawful conduct ordinarily may bring suit." Id. Accordingly, the Court must determine whether the Plaintiff title insurance companies have been

_____

[7]Manuel Ortiz, Sr., is not a board member of the Arroyo Hondo Grant. Because Section 49-1-11.1 only governs the conduct of the "board of trustees of a land grant-merced," its provisions are not enforceable against Manuel Ortiz, Sr.

injured by the filing of the Deeds and Declarations.  As previously explained, Plaintiffs

allege two types of injuries: (1) contingent liability on title insurance policies issued

before the filing of the Deeds and Declarations and (2) loss of business after the filing of

the Deeds and Declarations.  To determine whether these injuries are sufficient to confer

standing, the Court turns to federal law.  See Coll, 642 F.3d at 892 ("Standing under

Article III is, of course, a threshold issue in every case before a federal court, and

diversity claims are no exception.") (internal quotation marks and citations omitted)

*1.*     *Contingent Liability*

        In Protocols, LLC v. Leavitt, 549 F.3d 1294, 1295 (10th Cir. 2008), the Tenth

Circuit Court of Appeals considered whether "potential liability presents a sufficient

injury to confer standing under Article III of the United States Constitution."  In that case,

the plaintiffs, Protocols, LLC and the law firm of Sagrillo  Hammond Dineen and

Kastetter, LLC (hereinafter referred to collectively as "Protocols"), provided consulting

services for the settlement of worker's compensation claims.  Id.  In 2005, the Center for

Medicare and Medicaid Services (CMS) issued a memorandum construing federal

regulations in a manner so as to prohibit the compromise of future medical expenses

related to a worker's compensation injury.  Id. at 1297.  Protocols filed suit in the United

States District Court for the District of Colorado, alleging "that the 2005 Memo was

contrary to the prior practice of CMS and [seeking] a declaratory judgment that, among

other things, the 2005 Memo is invalid."  Id.  Protocols submitted evidence indicating that

it had "submitted proposed settlements structured in a manner that appears contrary to the

2005 Memo," that these settlements "exposed it to liability; and that this contingent

liability caused present harm to the financial strength and fiscal planning of the

company." Id. at 1297-98. Specifically, Protocols' affidavits demonstrated that:

> this potential (contingent) liability hanging over it hampers its business in
> several ways: (1) the company's value is decreased because of contingent
> liabilities; (2) the uncertainty of the liability harms Protocols' ability to plan
> how much revenue it may use for capital and operating costs; and (3) the
> company has postponed discussions with potential investors while awaiting
> the outcome of this lawsuit, because potential investors want to know about
> contingent liabilities.

Id. at 1299. The district court rendered summary judgment in favor of the defendants,

"on the ground that Protocols lacked standing under Article III of the United States

Constitution because its alleged injury was not concrete and actual or imminent." Id. at

1298 (internal quotation marks and citation omitted).

On appeal, the Tenth Circuit Court of Appeals recognized that "an injury in fact

must be actual and imminent and a contingent liability, by definition may not arise for a

considerable time, if ever." Id. at 1299 (internal quotation marks and citation omitted).

However, the Court concluded that "[t]he consequences of a contingent liability . . . may

well be actual or imminent." Id. In arriving at this conclusion, the Court relied on

Clinton v. City of New York, 524 U.S. 417 (1998), in which the United States Supreme

Court held that the "revival of a substantial contingent liability" was sufficient to confer

standing because it "immediately and directly affects the borrowing power, financial

strength, and fiscal planning of the potential obligor." Id. at 1300 (quoting Clinton, 524

U.S. at 431). "These immediate and direct effects were certainly actual and imminent."

Id.  Additionally, the Court noted that "[s]everal circuit court opinions further support the proposition that a contingent liability can present a sufficient injury for Article III standing. Id. (Citing Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton, 422 F.3d 490, 498 (7th Cir. 2005) ("[T]he present impact of a future though uncertain harm may establish injury in fact for standing purposes.") and Jones v. Gale, 470 F.3d 1261, 1267 (8th Cir. 2006) (feed lot owner had standing to challenge constitutionality of law that would prevent him from entering into certain contracts with out-of-state corporations; even though he had not entered into such contract, the law negatively affected his 'ability to earn income, borrow, and plan for [his] financial future)).

The Court concluded that Protocols' contingent liability was sufficient to confer Article III standing because Protocols admitted that it had "arranged settlements contrary to what CMS has declared to be required" and that it would be liable for any "future demand that Protocols reimburse Medicare for Protocols' portion of the settlement proceeds." Id. at 1301.  Additionally, Protocols adduced evidence indicating that "this potential liability has a present impact on its business–that is, the contingent liability has created an actual and imminent injury." Id.  Lastly, the Court determined that "[t]he other elements of standing–causation and redressability–follow readily from the above." Id.

Plaintiffs contend that, pursuant to Protocols, their contingent liability on title insurance policies issued prior to the filing of the Deeds and Declarations is sufficient to confer Article III standing.  The Court disagrees.  In Protocols, Protocols admitted that it

23

had structured settlements in violation of CMS' interpretation of the federal regulation

and that it would be liable for a demand for reimbursement.  Plaintiffs have made no such

admission and have failed to adduce any evidence indicating that they are liable to their

insureds for the alleged cloud on title generated by the filing of the Deeds and

Declaration.  Indeed, pursuant to the mandatory regulations cited by Plaintiffs in their

supplemental briefing, Plaintiffs are not liable to their insureds for any "[d]efects, liens,

encumbrances, adverse claims or other matters . . . attaching or created *subsequent to*" the

date of the title insurance policy.  NMAC 13.14.18.14 (emphasis added); see also NMAC

13.14.18.15.  Thus, although a single claim for title insurance benefits has been filed,

genuine issues of material fact exist with respect to whether Plaintiffs may be liable on

that claim and, therefore, whether a contingent liability actually exists.

Regardless, the Court concludes that Plaintiffs lack Article III standing because

they have failed to produce any evidence indicating that their alleged contingent liability

has actual or imminent consequences.  See id. at 299 (recognizing that a contingent

liability "may not arise for a considerable time, if ever," but holding that the

consequences of that liability "may well be actual or imminent" for the purpose of Article

III standing); see also Lac Du Flambeau Band of Lake Superior Chippewa Indians, 422

F.3d at 498 (holding that "[t]he present impact of a future though uncertain harm may

establish injury in fact for standing purposes.").  Indeed, in oral argument before this

Court, Plaintiffs admitted that their contingent liability has not had any present impact on

their business, although they contended that it has had a "very significant" impact on "the

companies' agent in Taos, David Height." [Rough Draft at 30]  To the extent that

Plaintiffs rely on Mr. Height's affidavit to support Article III standing, this contention is

rejected.  In his affidavit, Mr. Height avers that "new title insurance policies for

transactions *occurring after the filing of the Declarations and Deeds*, and containing

exceptions for same, have proven unacceptable to a number of buyers and mortgage

lenders, inhibiting new transactions and thus the sale of new title insurance policies."

[Doc. 26-3 (emphasis added)]  This evidence fails to establish that Plaintiffs' contingent

liability on title insurance policies issued *before* the filing of the Deeds and Declarations

has had a present adverse effect on Plaintiffs' business.  Indeed, the alleged loss of

business, which is addressed more thoroughly in the following section of this

*Memorandum Opinion and Order*, is due to the exceptions in "new title insurance

policies" issued "after the filing of the Declarations and Deeds," which absolve Plaintiffs

of liability for the alleged cloud on title created by the Deeds and Declarations.  In the

absence of any evidence indicating that Plaintiffs' contingent liability has caused an

actual or imminent harm, the Court concludes that the alleged injury is "too remote and

uncertain to afford Article III standing."  Essilor Laboratories of America, Inc. v. St. Paul

Fire and Marine Ins. Co., No. 08-C-296, 2009 WL 142323, at * 4 (E.D. Wis. January 20,

2009) (holding that plaintiff's contingent liability was "too remote and uncertain to afford

Article III standing" because the plaintiff had "not alleged that its current ability to

conduct its business is hampered because of the purported contingent liability").

2.      *Loss of Business*

25

Plaintiffs have produced evidence demonstrating that they have lost business on title insurance premiums as a consequence of the filing of the Deeds and Declarations. Plaintiffs contend that this loss of business is a sufficient injury-in-fact to confer Article III standing.  The Court declines to address Plaintiffs' constitutional argument, but instead proceeds directly to the dispositive issue of prudential standing.  See The Wilderness Soc, 632 F.3d at 1168 (declining to address constitutional standing or mootness because the plaintiff lacked prudential standing).

"[A] party's interest for the purposes of constitutional standing does not automatically confer prudential standing.  Prudential standing imposes different demands than injury in fact." Id., 632 F.3d at 1171.  Specifically, prudential standing "embodies judicially self-imposed limits on the exercise of federal jurisdiction." Elk Grove Unified School Dist., 542 U.S. at 11 (internal quotation marks and citation omitted).  As previously explained, "[t]he plaintiff must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." (The Wilderness Soc, 632 F.3d at 1168 (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)).

The Tenth Circuit Court of Appeals' analysis in The Wilderness Society, is instructive.  In that case, the plaintiff, an environmental group, filed an action challenging Kane County's rights of way over federal lands managed by the Bureau of Land Management and the National Park Service.  632 F.3d at 1164-65.  The plaintiff did not have a valid right of relief on its own but, rather, sought to enforce the federal government's property rights.  Id. a 1170.  The Tenth Circuit held that the plaintiff may

26

have suffered an injury in fact, but it nonetheless lacked prudential standing to pursue its

claim, explaining as follows:

> [The plaintiff] has taken sides in what is essentially a property dispute
> between two landowners, only one of which is represented (Kane County).
> But [the plaintiff] lacks any independent property rights of its own.  In that
> light, Judge McConnell's analogy is apt:
>
> Imagine that my next-door neighbor, who keeps his property neat and tidy,
> is faced with a competing claimant to the land, who is likely to allow the
> property to fill with weeds.  I might very much hope my neighbor wins.  My
> property values and aesthetic interests could be seriously affected.  I may be
> impatient with my neighbor's inclination toward compromise and apparent
> disinclination to go to court.  But no one would say I have standing to sue in
> defense of my neighbor's property rights. [The plaintiff] is in precisely that
> situation.

Id. at 1171 (internal quotation marks and citation omitted).  The Court expounded upon

the reason for the general rule against third-party standing:

> We "must hesitate before resolving a controversy ... on the basis of the
> rights of third persons not parties to the litigation" for two reasons.
> Singleton v. Wulff, 428 U.S. 106, 113, 96 S.Ct. 2868, 49 L.Ed.2d 826
> (1976). "First, the courts should not adjudicate such rights unnecessarily,
> and it may be that in fact the holders of those rights ... do not wish to assert
> them...."  Id. at 113–14, 96 S.Ct. 2868. BLM's absence from this case
> indicates that it does not wish to assert its rights against Kane County at this
> time or in this fashion. "Second, third parties themselves usually will be the
> best proponents of their own rights. The courts depend on effective
> advocacy, and therefore should prefer to construe legal rights only when the
> most effective advocates of those rights are before them." Id. at 114, 96
> S.Ct. 2868. Although this court has disagreed whether the federal
> government may adequately represent conservation groups' interests in R.S.
> 2477 quiet title cases, see Kane County, 597 F.3d at 1134 (summarizing
> San Juan County's various opinions), surely the federal government is the
> best advocate of its *own* interests.

Id. at 1171-72 (emphasis in original).  Accordingly, the Court determined that the plaintiff

lacked prudential standing.

As in The Wilderness Society, Plaintiffs in the present litigation are taking sides in a property dispute between adverse land claimants, only one of whom (the Board) is represented.  Plaintiffs are seeking to enforce the private property interests of landowners within the Patent Land and yet those landowners are not parties to the present litigation and their interests are not represented.  To the extent that Plaintiffs have an economic interest in the outcome of this dispute over local property rights, their interest is contingent upon, and entirely derivative of, the alleged diminishment and extinguishment of the landowners' private property interests under § 49-1-11.1(B) .  See The Wilderness Soc., 632 F.3d at 1174 (holding that the plaintiff lacked prudential standing because its "claim is derivative of the United States" and "expressly conditioned on the recognition of local property rights and necessarily entails the discretion of the United States as a property owner").  It is not clear why the private property landowners are not parties to the present litigation; perhaps they do not wish to assert their own rights at this time or in this fashion or perhaps their participation would defeat the basis for this Court's diversity jurisdiction.  Either way, the Court holds that the private property landowners themselves are the "best advocate[s] of their own interests" and, therefore, declines to exercise jurisdiction over Plaintiffs' claims.  Id. at 1172; Cf. Allstate Ins. Co. v. Thrifty Rent-A-Car Systems, Inc., 249 F.3d 450, 457 (6th Cir. 2001) (holding that the plaintiff insurance company lacked prudential standing to seek a declaratory judgment regarding the defendant's vicarious tort liability).

28

The Court recognizes that jurisdiction may be proper when "countervailing considerations" exist, but there is no evidence of "countervailing considerations" in this case.  The Wilderness Soc., 632 F.3d at 1172.  "Countervailing considerations" exist when the third-party's right is "inextricably bound up with the activity the litigant" wishes to pursue and there is "some genuine obstacle to the third party asserting his own rights."  Id. (internal quotation marks and citations omitted); see also Lane v. Simon, 495 F.3d 1182, 1187 (10th Cir. 2007).  ("Third-party standing requires not only an injury in fact and a close relation to the third party, but also a hindrance or inability of the third party to pursue his or her own claims." (internal quotation marks and citation omitted)).  Although Plaintiffs' rights might be inextricably bound up with the private property rights of the landowners by virtue of the contract for title insurance, there is no indication that there is some genuine obstacle to the landowners' assertion of their own rights.  Accordingly, the Court concludes that Plaintiffs lack prudential standing to raise a claim under Section 49-1-11.1(B).

## IV.   **CONCLUSION**

Assuming without deciding that a private right of action exists under Section 49-1-11.1(B), the Court nonetheless concludes that Plaintiffs lack standing to raise this claim.  To the extent that Plaintiffs rely on their alleged contingent liability on title insurance policies issued before the filing of the Deeds and Declarations, the Court concludes that they lack constitutional standing.  To the extent that Plaintiffs rely on their alleged loss of business as a consequence of the filing of the Deeds and Declarations, the Court

concludes that they lack prudential standing.

**IT IS THEREFORE ORDERED** that *Plaintiffs' Motion for Summary Judgment and Request for Expedited Consideration of Same* [Doc. 26] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' *Complaint for Declaratory Judgment and Injunction* [Doc. 1] is **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED** this 29th day of August, 2012, in Albuquerque, New Mexico.


M. CHRISTINA ARMIJO
United States District Judge